**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CRUM & FORSTER SPECIALTY INSURANCE COMPANY,** *Plaintiff,* | : | **CIVIL ACTION** |
| v. | : | **NO. 25-1041** |
| **ARMOUR RISK MANAGEMENT, INC.**, n/k/a A.G. Risk Management Inc., *Defendant.* | : | |

NITZA I. QUIÑONES ALEJANDRO, J. AUGUST 20, 2026

# MEMORANDUM OPINION

## INTRODUCTION

Plaintiff Crum & Forster Specialty Insurance Company, ("Plaintiff"), filed a civil action against its insured, Defendant A.G. Risk Management, Inc., ("Defendant" or "Insured"), pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and Federal Rule of Civil Procedure, ("Rule"), 57, seeking in the sole Count of its complaint, a declaratory judgment that it owes no duty to defend and/or indemnify Defendant under an excess liability insurance policy that Plaintiff issued to Defendant, regarding coverage for an underlying independent dispute between Defendant and Arch Specialty Insurance Company, ("Arch"). Defendant is a claims-handler for Arch. The excess insurance policy is a "Claims Made and Reported Policy." In its complaint, Plaintiff avers that Defendant is seeking coverage for a matter that does not qualify as a timely reported "Claim" under the policy.

In its answer to the complaint, Defendant also filed affirmative defenses and a counterclaim (ECF 9). Specifically, the counterclaim includes a breach of contract claim, (Count I), and bad faith claims, (Counts II-III), for Plaintiff's alleged failure to provide coverage.

Presently, before the Court is Defendant's motion for partial judgment on the pleadings, (ECF 13), Plaintiff's response in opposition, (ECF 18), and Defendant's reply, (ECF 26). In its motion, Defendant argues that this Court should grant judgment in its favor on Count I of Plaintiff's complaint (declaratory judgment) and on Count I of Defendant's counterclaim (breach of contract) on the grounds that Defendant is owed coverage for the potential bad faith action. In its opposition, Plaintiff argues that Defendant's motion is procedurally deficient and, even if it were not, judgment for Defendant is not appropriate. For the reasons set forth herein, this Court agrees that partial judgment for Defendant is not appropriate, and denies Defendant's motion.

**BACKGROUND**

The factual and procedural histories relevant to Defendant's motion for partial judgment on the pleadings are as follows:[1]

> Plaintiff is an insurance company. Defendant is a claims-handler for insurance companies. Plaintiff issued to Defendant an excess professional liability insurance Policy, No. EOL-225803, (the "Excess Policy"), for a claims made period commencing January 1, 2020 and ending February 1, 2021; the policy was later amended to expire on June 30, 2021 with a one year Extended Reporting Period of June 30, 2021 to June 30, 2022. (ECF 1 at ¶¶ 7, 29); (ECF 9 at p. 5 ¶ 29).
>
> Plaintiff seeks a declaration from this Court that it owes Defendant no duty to defend and/or indemnity for any extracontractual liability claims arising from Defendant's claims-handling services to Arch regarding a personal injury matter that proceeded to trial and resulted in an excess verdict. (ECF 1 at ¶ 1); (ECF 9 at p. 1 ¶ 1).
>
> The pertinent facts of that personal injury matter are as follows: On January 19, 2018, Arch's insured, Consolidated Construction Services LLC, ("CCS"), was named a defendant in a personal injury action for allegedly knocking over a concrete wall and causing bodily injuries to the plaintiff in that lawsuit. (ECF 9-3 at p. 3). On February 19, 2019, Arch transferred its defense of that action against CCS, (the "CCS Lawsuit"), to the herein Defendant pursuant to a Loss Portfolio Transfer Reinsurance Agreement, ("LPT Agreement"), and Administrative Services Agreement, ("ASA Agreement"), between Arch and Defendant. (*Id.*). At a February 2020 mediation, the plaintiff communicated a policy limits demand that

[1] This summary is drawn from the parties' various filings.

was rejected on March 6, 2020, by Defendant's claim adjuster. (*Id.* at p. 4). The matter proceeded to trial and resulted in a jury verdict in the plaintiff's favor against CCS in an amount in excess of the policy limits. (*Id.*).

On November 30, 2020, Defendant and Arch entered into a Commutation Agreement to terminate Defendant's claims-handling services to Arch. (ECF 1 at ¶ 29); (ECF 9 at ¶ 29). Pursuant to the provisions of the Commutation Agreement Arch was "entitle[d] . . . to indemnification from [Defendant] for, *inter alia*, 'any and all liabilities, claims, damages and expenses (including reasonable attorneys' fees and expenses) . . . incurred by [Arch], arising out of, caused by, or constituting any actual or alleged: (i) Pre-Commutation ECO Liabilities. . ." (ECF 9-3 at p. 3). "Pre-Commutation ECO Liabilities" are defined as "liabilities arising from Ceded [Extra Contractual Obligations, ("ECO")]" related to Defendant's claims-handling conduct that occurred prior to the effective date of the Commutation Agreement. (ECF 13-4 at p. 5).

Pursuant to the terms of the Commutation Agreement, Arch, by letter dated June 11, 2021, (the "June 2021 Letter"), placed Defendant on notice of "Pre-Commutation ECO Liabilities"[2] and "Transition ECO Liabilities"[3]. (ECF 1-5 at p. 3). With said notice, Arch enclosed a "Schedule for the specific matters noticed" – a spreadsheet titled "[Defendant] Pre-Commutation Eco and Transition Eco Liabilities" with four columns: (1) "Claim Number;" (2) "Insured"; (3) "Brief Explanation"; and (4) "State." (*Id.* at p. 4-6). Pertinent here, one of the rows of the spreadsheet listed CCS as the "Insured" with a specified "Claim Number" and the "Brief Explanation" as being "Tender not responded to." (*Id.* at p. 5). Defendant received the June 2021 Letter on June 11, 2021. (ECF 9 at ¶ 32).

On August 9, 2021, Defendant provided a copy of the June 2021 Letter to Plaintiff by email, (the "August 2021 Email"). (ECF 1 at ¶ 32); (ECF 1-5 at pp. 1-2). The August 2021 Email provides, in relevant part, as follows:

> Please see the attached Notice of Claim which is being reported to your office under the captioned policy. Under the terms of the commutation agreement, within 180 days of the closing, Arch was required to put [Defendant] on notice of any claim involving [Defendant's] claim handling that could potentially result in a claim

---

[2] The Commutation Agreement defines "Pre-Commutation ECO Liabilities" as "liabilities arising from Ceded ECO that involve Policy claims that are: (a) closed as of the Commutation Effective Time and related to [Defendant's] conduct that occurred prior to the Commutation Closing Date; and (b) open as of the Commutation Effective Time, related to [Defendant's] conduct that occurred prior to the Commutation Effective Time and reported by [Arch] to [Defendant] by the Sunset Date." (ECF 13-4 at p. 5). "Ceded ECO" is defined as "all ECO that does not constitute Retained ECO." (ECF 13-5 at p. 4).

[3] The Commutation Agreement defines "Transition Eco Liabilities" as "liabilities arising from [Defendant's] conduct that occurred during the period beginning on the Execution Date and ending on the Claims Transition Date." (ECF 13-4 at p. 6).

> seeking extracontractual damages. Accordingly, it was in Arch's interest to be over-inclusive and notify [Defendant] of any matters that might even remotely result in an extracontractual liability claim. . .

(ECF 1-5 at p. 1).

Following receipt of the August 2021 Email, Plaintiff sent an email reserving all of its rights under the Primary Policy and the Excess Policy, and requesting copies of any coverage correspondence issued by the Primary Insurer as respects the June 2021 Letter. (ECF 1 at ¶ 36).

Nearly two years later, on March 30, 2023, Arch sent a letter, (the March 2023 Letter"), to Defendant notifying Defendant that Arch understood that the CCS Lawsuit plaintiff intended to pursue a bad faith claim against Arch, (the "Arch Insurance Matter"), based on Defendant's rejection of Plaintiff's policy-limits demand made during the February 2020 mediation and demanding indemnification in connection the same. (*See* ECF 9-3). Defendant provided the March 2023 Letter to Plaintiff on April 14, 2023. (ECF 9-2 at p. 2). Defendant seeks defense and indemnity coverage in connection with the Arch Insurance Matter from Plaintiff. (ECF 1 at ¶ 43). By letters dated May 17, 2023 and August 13, 2023, Plaintiff advised Defendant that it owes no coverage for the Arch Insurance Matter, asserting that the claim was first made and reported in 2023, after all coverage periods had lapsed. (ECF 1 at ¶¶ 42, 43); (*See* ECF 9-2).

The following policies are relevant to this insurance coverage dispute. From January 1, 2020 through June 30, 2021, Defendant was insured for, *inter alia*, "Insurance Services Wrongful Act[s]"[4] under an Insurance Services Professional Liability Insurance Policy, (the "Primary Policy"), issued by Nautilus Insurance Company and under a First-Excess Insurance Policy, (the "Underlying Excess Policy"), by Certain Underwriters at Llyod's, London Syndicate 2987. (ECF 1 at ¶¶ 13-14). During the same period, Defendant was also covered by a Claims Made and Reported Excess Liability Policy, (the "Excess Policy"), issued by Plaintiff. (*Id.* at ¶ 13). Defendant purchased an Extended Reporting Period for the year commencing June 30, 2021 to June 30, 2022 for the Primary Policy and Excess Policy. (*Id.* at ¶¶ 12, 15). Because the underlying limits provided by the Primary Policy and the Underlying Excess Policy were fully exhausted prior to the June 2021 Letter and the March 2023 Letter, Plaintiff's Excess Policy is the focus of the parties' dispute. (*Id.* at ¶ 16).

The Excess Policy follows form from the Primary Policy. (*Id.* at ¶¶ 17-18). That is, the terms, conditions, limitations, exclusions, and endorsements in the

[4] "Insurance Services Wrongful Act[s]" are defined as "any actual or alleged act, error or omission committed by any Insured . . . arising solely from the performance of, or failure to perform, the Insured's Professional Services." (ECF 1-4 at p. 22).

Primary Policy are incorporated into the Excess Policy unless otherwise stated. (*Id.*). The Insuring Agreement of the Primary Policy provides, in relevant part, that:

> [The insurance company issuing this Policy, or "Insurer"] agrees to pay on behalf of the Insured [here, Defendant] all sums in excess of the Deductible, up to the Limit of Liability, that the Insured shall become legally obligated to pay as Damages and Claim Expenses arising from a Claim[5] that is both first made against the Insured and reported in writing to the [Insurer] in accordance with section V.A. of the Policy. . .

(ECF 1-4 at p. 18). Additionally, a "Claim shall be considered first made when it is received by any Insured." (*Id.* at p. 19).

> *Section V.A.* of the Primary Policy provides as follows:
>
> 1. Notifying the [Insurer] of a Claim
>
> As a condition precedent to the obligations of the [Insurer] under this Policy, an Insured shall give the [Insurer] written notice of a Claim first made against the Insureds during the Policy Period, as soon as practicable after an Executive Officer becomes aware of the Claim, but in no event later than 60 days after the expiration of the Policy Period.
>
> 2. Notifying the [Insurer] of a Potential Claim
>
> If during the Policy Period the Insured becomes aware of any Wrongful Act that may reasonably be expected to be the basis of a Claim against any Insured and during the Policy Period gives written notice to the [Insurer] of such Wrongful Act and the reasons for anticipating a Claim with full particulars, including, but not limited to:
>
> a. the specific Wrongful Act;
> b. the dates and persons involved;
> c. the identify of anticipated or possible claimants; and
> d. the circumstances by which the Insured first became aware of the possible Claim;
>
> then any such Claim that arises out of such reported Wrongful Act and that is subsequently made against the Insured and reported to

[5] The term "Claim" is defined as "a written demand for money or services received by the Insured and arising out of any Wrongful Act, including service of suit, the institution of any alternative dispute resolution proceeding or any written request to toll or waive the statute of limitations." (ECF 1-4 at p. 20).

> the [Insurer] shall be deemed to have been made at the time such notice was given by the [Insurer] . . .

(*Id.* at pp. 25-26).

The Excess Policy modifies the Insuring Agreement of the Primary Policy only to specify to which address notices of claims should be directed. (ECF 1-3 at p. 2). Under the terms of the Endorsement that added the Extended Reporting Period to the Excess Policy, Defendant retained the same ability to provide notice of claims "but only with respect to claims first made during such Extended Reporting Period for matters otherwise covered under the Policy." (ECF 1-3 at p. 11).

**LEGAL STANDARD**

Motions for judgment on the pleadings are governed by Rule 12(c). *See* Fed. R. Civ. P. 12(c). Specifically, Rule 12(c) provides that a party may move for a judgment on the pleadings "after the pleadings are closed — but early enough not to delay trial. . ." *Id.* Pursuant to Rule 12(c), judgment on the pleadings shall be granted only if "the moving party has established that there is no material issue of fact to resolve, and that it is entitled to judgment as a matter of law." *Trinity Indus., Inc. v. Greenlease Holding Co.*, 903 F.3d 333, 349 (3d Cir. 2018) (citation omitted).

In making this determination, "[t]he court 'must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party.'" *Atiyeh v. Nat'l Fire Ins. Co.*, 742 F. Supp. 2d 591, 595 (E.D. Pa. 2010) (quoting *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005)). Ordinarily, "the Court considers the pleadings and exhibits attached thereto, matters of public record and 'undisputedly authentic documents attached to the motion for judgment on the pleadings if plaintiffs' claims are based on the documents.'" *Havassy v. Mercedes-Benz Fin. Servs. USA, LLC*, 432 F. Supp. 3d 543, 545 (E.D. Pa. 2020) (internal citation omitted).

**DISCUSSION**

In its motion for partial judgment on the pleadings, Defendant seeks a judgment in its favor on Plaintiff's declaratory judgment and Defendant's breach of contract claims, and argues that it is entitled to coverage for the Arch Insurance Matter as a matter of law under the Excess Policy, and that Plaintiff's denial of coverage constituted a breach of the Excess Policy insurance contract. In response, Plaintiff disagrees and argues that Defendant is not entitled to judgment because the June 2021 Letter is not a "Claim", the March 2023 Letter was considered a "Claim" that was untimely reported, and there was no timely notice of any potential claim associated with the Arch Insurance Matter for coverage purposes.[6] Because neither party identifies a material issue of fact, the Court addresses each of the claims in turn, starting with Defendant's counterclaim.

***I. Defendant's Counterclaim Count I - Breach of Contract***

"To establish a breach of an insurance contract claim, it is necessary 'for the insured to show a claim within the coverage provided by the policy.'" *Morrison v. Selective Ins. Co. of the Se.*, No. CV 21-4731-KSM, 2022 WL 11804032, at *2 (E.D. Pa. Oct. 19, 2022) (quoting *Miller v. Boston Ins. Co.*, 218 A.2d 275, 277 (Pa. 1966)). "A determination of coverage under an insurance policy is a question of law to be decided by the court." *Weinberg v. Nationwide Casualty & Ins. Co.*, 949 F. Supp. 2d 588, 593 (E.D. Pa. 2013). Because the Excess Policy was issued and/or delivered to Defendant within this judicial district and a substantial part of the events giving rise

---

[6] Plaintiff also argues that Defendant's motion must be denied as procedurally deficient because it relies on the following; *to wit*: matters outside of the pleadings; arguments that contradict its answer to Plaintiff's complaint; and arguments that are premature. These arguments are unpersuasive. Plaintiff's challenge to Defendant's reliance on matters outside of the pleadings has been addressed by separate Order ruling on Plaintiff's motion to strike those matters from the instant motion. (*See* ECF 51). Moreover, Plaintiff's challenges to the propriety of certain arguments within Defendant's motion are addressed by the Court to the extent said arguments are pertinent to the Court's analysis.

to the issues in dispute occurred in this District, (*see* ECF 1 at ¶ 9), the Court looks to Pennsylvania law to guide its analysis. *See Fed. Ins. Co. v. Gen. Mach. Corp.*, 699 F. Supp. 490, 494 n.4 (E.D. Pa. 1988) (finding Pennsylvania law governed the court's interpretation of insurance policy coverage where the "insurance policy was issued and delivered in Pennsylvania").

Pennsylvania law proscribes that "[i]f the insurance contract's language is unambiguous, the Court will simply apply it; if, however, a provision of the contract is ambiguous, it is construed against the insurer, the drafter of the agreement." *Weinberg*, 949 F. Supp. 2d at 593 (citing *Regents of Mercersburg Coll. v. Republic Franklin Ins. Co.*, 458 F.3d 159, 172 (3d Cir. 2006)). "An insurance policy term is deemed to be 'ambiguous if reasonable people, considering it in the context of the entire policy, could fairly ascribe different meanings to it . . .'" *Hofkin v. Provident Life & Acc. Ins. Co.*, 81 F.3d 365, 371 (3d Cir. 1996) (quoting *Atlantic Mut. Ins. Co. v. Brotech Corp.*, 857 F. Supp. 423, 427 (E.D. Pa. 1994)). "Correspondingly, if a policy can be read only one way, then the contract is unambiguous." *Elite Restoration, Inc. v. First Mercury Insurance Co.*, 2020 WL 907812, at * 2 (E.D. Pa. Feb. 25, 2020) (citation modified).

Here, the Primary Policy, to which the Excess Policy follows form,[7] provides that Plaintiff (subject to additional conditions not in dispute here), is legally obligated to provide coverage for "a Claim that is both first made against the Insured and reported in writing to [Plaintiff] in accordance with Section V.A[.]" (ECF 1-4 at p. 18). Section V.A sets forth notice requirements for both a Claim and a Potential Claim. (*Id.* at p. 25).

For *a Claim*, Section V.A.1 provides that "written notice of a Claim first made against the Insureds during the Policy Period [*i.e.*, January 1, 2020 to June 30, 2021]" shall be given "as soon

---

[7] The Insuring Agreement of the Excess Policy provides that it "shall provide coverage in accordance with the same terms, conditions and limitations of the Followed Policy," subject to the Excess Policy's modification and limitations which are not relevant here. (ECF 1-3 at p. 2).

as practicable . . . but in no event later than 60 days after the expiration of the Policy Period." (ECF 1-4 at p. 25). For *a Potential Claim,* Section V.A.2 provides that "written notice . . . of [a Wrongful Act that the Insured becomes aware of during the Policy Period that may reasonably be expected to be the basis of a Claim] and the reasons for anticipating a Claim with full particulars" may be given during the Policy Period. (ECF 1-4 at pp. 25-26).

Section V.A.2. further provides that "any such Claim [made against the Insured and reported to Plaintiff] that arises out of such" reporting "shall be deemed to have been made at the time such written notice was given[.]" (*Id.* at p. 26).

With the Excess Policy's Extended Reporting Period Endorsement, Defendant purchased additional notice rights. The Endorsement provides that "with respect to claims first made during the Extended Reporting Period [*i.e.*, June 30, 2021 to June 30, 2022,]" Defendant was permitted to "notify the Insurer of claims in accordance with" the Notices provision of the Excess Policy. (ECF 1-3 at p. 11). Said Notices provision of the Excess Policy provides that "[w]here the Followed Policy requires or permits notice to its insurer, the Policyholder or the insureds have the same obligations and rights to notify the Insurer" except the notice must be transmitted to Plaintiff's e-mail address for claims and Plaintiff's mailing address for all else. (*Id.* at p. 2).

Here, Defendant argues that Plaintiff breached its insurance obligation when it denied coverage for the Arch Insurance Matter because (a) the "Claim" was first made against Defendant in the June 2021 Letter during the Policy Period and Defendant timely provided Plaintiff with written notice of the June 2021 Letter; or (b) alternatively, the June 2021 Letter constitutes a "Potential Claim" that was properly noticed during the Extended Reporting Period such that the relation-back clause operates to make any eventual "Claim" for the Arch Insurance Matter timely. Plaintiff disagrees. Each argument is addressed in turn.

***i. The June 2021 Letter is Not a "Claim"***

Under the Primary Policy which the Excess Policy follows form, a "Claim" is defined as "a written demand for money or services received by the Insured and arising out of any Wrongful Act[8], including the service of suit, the institution of any alternative dispute resolution proceeding or any written request to toll or waive the statute of limitations." (ECF 1-4 at p. 20). Here, the parties agree that claim-defining policy language is not ambiguous. This Court agrees. Thus, discerning no ambiguity, the Court applies its plain meaning to determine whether the June 2021 Letter constitutes a "Claim."

Undisputedly, the June 2021 Letter is a writing received by Defendant from Arch. It is composed of a "notice of" specific matters that may constitute extracontractual liabilities arising from Defendant's alleged claims-handling services for Arch and for which Arch would be entitled to indemnification from Defendant pursuant to the parties' Commutation Agreement. Effectively, the June 2021 Letter is notice to Defendant that Arch's insureds have a potential extra contractual liability claim(s) against Arch and that the defense of those claims would be Defendant's responsibility. The letter further memorializes Defendant's indemnification obligation to Arch and the matters that fall under that obligation. Based on the Court's review of the June 2021 letter, it is apparent that the June 2021 Letter was clearly a notice – not a "written demand for money or services" such that it is a "Claim."

This Court is further guided in its opinion by similar interpretations in this District applying the same or similar phrase – "a written demand for money or services" – to determine when a

[8] As applicable here, a "Wrongful Act" is "any actual or alleged act, error or omission committed by any Insured or by any person whose act, error or omission the Insured is legally responsible, arising solely from the performance of, or failure to perform, the Insured's Professional Services." (ECF 1-4 at p. 22).

correspondence constitutes a claim.[9] *See Carosella & Ferry, P.C. v. TIG Ins. Co.*, 189 F. Supp. 2d 249, 245-55 (E.D. Pa. 2001) (finding that a "demand . . . for money or services. . ." existed in a letter that set forth an intention to file a lawsuit against a policyholder, instructed the policyholder to contact its malpractice insurance carrier, requested contact information for that carrier's counsel to provide to the underlying case's plaintiff, and set forth the damages giving rise to the intended lawsuit); *see also Landmark American Insurance Co. v. NurSelect LLC*, 2025 WL 673632, at *3-4 (E.D. Pa. Mar. 3, 2025) (finding a "written demand for monetary relief" existed in a letter that informed its recipient policyholder of an impending joinder complaint). Here, unlike *Carosella* and *Landmark*, the June 2021 Letter makes no demands of its recipient, either by instructing it to retain counsel or by informing it of an impending legal action seeking money or other judgment.

To compel an alternate conclusion, Defendant urges this Court to consider the relationship between Defendant and Arch and find that Defendant would have understood the June 2021 Letter as a "demand for money" in the form of indemnification. However, Defendant cites no authority to support that the Court's construction of a writing must be subjective. Accordingly, the consideration of Defendant's relationship with Arch would not alter this Court's conclusion that the June 2021 Letter is not a "Claim."

***ii. The March 2023 Letter is a "Claim"***

Conversely, Plaintiff argues that the March 30, 2023 Letter from Arch to Defendant constitutes a "Claim" under the policy. This Court agrees. The subject line of the letter reads "Notice and Demand for Indemnification." (*See* ECF 9-3 at p. 2). It explicitly provides that Arch understands that the plaintiff in the CCS Matter intends to pursue a bad faith claim against Arch based on Defendant's rejection of the underlying plaintiff's policy-limit demand and will seek to

---

[9] Defendant's argument to the contrary is made in reliance on caselaw outside of this District and, thus, has little persuasiveness.

recover the amount of the excess judgment against CCS (at least $7 million plus interest) from Arch. (*Id.* at pp. 4-5). It "demands that [Defendant] fulfill its obligations . . . and indemnify Arch for 'any and all liabilities, claims, damages and expenses (including reasonable attorneys' fees and expenses)' incurred or to be incurred by Arch as a result of [Defendant's] role in the matter." (*Id.* at p. 5). It further demands that Defendant provide Arch with its insurance policies and notify its own insurance carriers of Arch's "Notice and Demand for Indemnification." (*Id.* at p. 6). Accordingly, the March 30, 2023 Letter constitutes a "written demand for money or services. . . arising out of [a] Wrongful Act" such that it is plainly a "Claim" under the terms of Plaintiff's Excess Policy.

***iii. Notice of the March 30, 2023 Claim was Untimely***

Having determined that the March 30, 2023 Letter is a "Claim," the question that follows is whether the notice of it was timely. As noted, the notice provisions of the Excess Policy follow Section V.A.1-2 of the Primary Policy and are extended by way of the Endorsement. The provisions of Section V.A.1 and the Endorsement are contingent on a Claim first being made during the Policy Period and Extended Reporting Period, respectively. (*See* ECF 1-4 at p. 25) ("an Insured shall give [Plaintiff] written notice of a Claim first made . . . during the Policy Period"); (*see* ECF 1-3 at p. 11) ("the Insured shall be permitted to notify the Insurer of claims . . but only with respect to claims first made during such Extended Reporting Period"). Because the March 30, 2023 Claim was "first made" after both the Policy Period and Extended Reporting Period expired, notice would have only been potentially viable pursuant to Section V.A.2.

Specifically, Section V.A.2 provides as follows:

> 2. Notifying [Insurer] of a Potential Claim
> If ***during the Policy Period*** the Insured becomes aware of any Wrongful Act that may reasonably be expected to be the basis of a Claim against any Insured and ***during the Policy Period gives written notice*** to [Insurer] of such Wrongful Act

> and the reasons for anticipating a Claim with full particulars, including but not limited to:
>
> a. the specific Wrongful Act;
> b. the dates and persons involved;
> c. the identity of anticipated or possible claimants; and
> d. the circumstances by which the Insured first became aware of the possible Claim;
>
> then any such Claim that arises out of such reported Wrongful Act and that is subsequently made against the Insured and reported to the [Insurer] ***shall be deemed to have been made at the time such written notice was given*** to the [Insurer]. . .

(ECF 1-4 at pp. 25-26) (emphasis added).

A "Wrongful Act" is defined, in relevant part, as "any actual or alleged act, error or omission committed by any Insured . . . arising solely from the performance of, or failure to perform, the Insured's Professional Services." (ECF 1-4, at p. 22). The June 2021 Letter provides that Defendant's handling of the CCS Claim gave rise to extra contractual liability insofar as a "[t]ender [went] not responded to." (ECF 1-5 at p. 5). As such, this suffices to be an "alleged act, error or omission . . arising from" Defendant's services such that it constitutes a "Wrongful Act." Thus, Defendant was aware of a "Wrongful Act that may reasonably be expected to be the basis of a Claim" during the Policy Period by way of the June 2021 Letter, which Defendant received on June 11, 2021. However, Defendant failed to provide written notice of the June 2021 Letter during the Policy Period, as required for Section V.A.2 to apply. Rather, Defendant notified Plaintiff of the June 2021 Letter by email on August 9, 2021.

Defendant argues that because it notified Plaintiff of the June 2021 Letter during the Extended Reporting Period by email dated August 9, 2021, the March 2023 Claim is deemed first made on August 9, 2021, and is timely. Defendant's logic is misguided. Even assuming, *arguendo*, that Defendant correctly interprets the Endorsement as providing for extended notice of "[potential] claims first made" during the Extended Reporting Period, the August 2021 Email is

but a notice of a potential claim first made by the July 2021 Letter – not a "potential claim" in itself.

For these reasons set forth, Defendant failed to provide proper notice of the March 2023 Claim to Plaintiff under any potentially applicable provision. Thus, because the CCS Matter does not "aris[e] from a Claim that [wa]s both first made against the Insured and reported in writing to [Plaintiff] in accordance with section V.A." of the Primary Policy, (ECF 1-4 at p. 18), to which the Excess Policy follows form, this Court finds that Plaintiff has no duty to provide coverage for the Arch Insurance Matter under the provisions of the policy. Accordingly, Defendant's breach of contract counterclaim based on Plaintiff's denial of coverage necessarily fails.

### ***II. Plaintiff's Count I – Declaratory Judgment***

The Declaratory Judgment Act provides that a district court may, "[i]n a case of actual controversy within its jurisdiction . . . declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201. "An insurer may seek a declaratory judgment with respect to the obligations of the parties under an insurance contract, including the question of whether the insurer has a duty to defend and/or indemnify a party making a claim under the policy." *Scottsdale Ins. Co. v. City of Easton*, 379 F. App'x 139, 144 (3d Cir. 2010) (citing *Gen. Accident Ins. Co. of Am. v. Allen*, 692 A.2d 1089, 1095 (1997)).

"Under Pennsylvania law, determination of whether a policy provides or excludes coverage for a certain claim 'necessarily determine[s]' whether an insurer has a duty to defend or indemnify an insured against a related third-party lawsuit." *Elite Restoration*, 2020 WL 907812, at *3 (quoting *Allen*, 692 A.2d at 1093). "Thus, if the insurance policy does not cover a claim, then the insurer does not have a duty to defend or indemnify the insured for that claim." *Id.* Here, the Court finds that the policy does not cover the Arch Insurance Matter, as a matter of law, and, therefore, Defendant does not have a duty to defend and/or indemnify Defendant regarding third-

party lawsuits related to the Arch Insurance Matter. Accordingly, judgment is granted in Plaintiff's favor as to its declaratory judgment claim.

***III. Counterclaim Count II and III – Bad Faith***

Generally, resolving "a coverage claim . . . in favor of the insurer requires dismissal of a bad faith claim premised on the denial of coverage[.]" *Gold v. State Farm Fire & Cas. Co.*, 880 F. Supp. 2d 587, 597 (E.D. Pa. 2012). However, "if bad faith is asserted as to conduct beyond a denial of coverage, the bad faith claim is actionable as to that conduct regardless of whether the contract claim survives." *Id.* at 598. Here, Defendant makes one allegation of bad faith beyond Plaintiff's denial of coverage. (*See* ECF 9 at ¶¶ 47-63) (averring that Plaintiff acted in bad faith by, *inter alia*, failing to timely advise of its coverage position as to the June 2021 Letter for nearly 21 months). Given the Court's finding that the June 2021 Letter is not a Claim and that Plaintiff's receipt of the June 2021 Letter required no action, there is no basis on which to find bad faith for the alleged delay or otherwise. Accordingly, Defendant's bad faith claims must also be dismissed. *See Jones v. Allstate Property and Casualty Ins. Co.*, 552 F. Supp. 3d 498, 506 (E.D. Pa. 2021) (noting an insured's frustration over inability to secure coverage and the insurer's initial evasiveness on the issue understandable but dismissing the insured's bad faith claim because "there is no basis on which to find bad faith" for a claim that falls outside coverage).

**CONCLUSION**

For the reasons set forth, Defendant's motion for partial judgment in its favor on Count I of Plaintiff's complaint (declaratory judgment) and on Count I of its counterclaim (breach of contract) is denied. As such and in light of this ruling, the remainder of Defendant's bad faith counterclaims, (at Counts II-III), are also dismissed, and Plaintiff's request for declaratory

judgment is granted. Having dismissed Defendant's counterclaims and having granted Plaintif's declaratory judgment claim finding that Plaintiff owes no duty to defend and/or indemnify Defendant under the Excess Liability Policy, judgment is granted in favor of Plaintiff and against Defendant. A corresponding Order will be issued accompanying this opinion.

*NITZA I. QUIÑONES ALEJANDRO*, J.